698 A.2d 1259

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CHARLES T. MOORE, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JEFFREY T. FELTON, DEFENDANT–APPELLANT.[1]

Superior Court of New Jersey
Appellate Division

Argued January 7, 1997—Decided May 6, 1997.

---

[1] We have consolidated these appeals for purposes of opinion.

Before Judges PRESSLER and STERN.

*Philip De Vencentes* argued the cause for appellant Charles T. Moore (*Galantucci & Patuto*, attorneys; *Mr. De Vencentes*, on the brief).

*Vincent W. Basile* argued the cause for appellant Jeffrey T. Felton (*Flood & Basile*, attorneys; *Mr. Basile*, on the brief).

*Barbara Peterson*, Special Deputy Attorney General, Acting Assistant Bergen County Prosecutor, argued the cause for respondent (*Charles R. Buckley*, Deputy Attorney General—In Charge, Acting Bergen County Prosecutor, attorney; *Ms. Petersen*, of counsel and on the letter brief).

The opinion of the court was delivered by

STERN, J.A.D.

Defendants Charles T. Moore and Jeffrey T. Felton were jointly tried and convicted of first degree possession with intent to distribute more than five ounces of cocaine, contrary to *N.J.S.A.* 2C:35–5a(1), –5b(1) (count one), and possession of cocaine, contrary to *N.J.S.A.* 2C:35–10a(1) (count two). The trial judge merged count two into count one and sentenced both defendants to a term of fifteen years in the custody of the Commissioner of Corrections with a five year parole ineligibility term on the first count. Defendants' driver's licenses were suspended for eighteen months, and a $3,000 Drug Enforcement Demand Reduction penalty, a $75 Safe Neighborhood Service Fund assessment, a $50 Violent Crimes Compensation Board penalty, and a $50 forensic laboratory fee were imposed on each.

In his appeal Moore argues:

POINT I  *THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS IN- STRUCTIONS TO THE JURY, REQUIRING A REVERSAL OF DEFEN- DANT'S CONVICTION* [Not Raised Below]

a. *The trial court committed reversible error when it instructed the jury with respect to N.J.S.A. 2C:35–5 that the "State need not prove the Defendant's knowledge of the quantity of drugs . . ."*

b. *The trial court erred in failing to instruct the jury on "mere presence" as an essential part of the definition of "constructive" possession*

c. *The trial judge committed reversible error in failing to instruct the jury sua sponte in accordance with State v. Hampton and State v. Kociolek*

POINT II  *THE ADMISSION INTO EVIDENCE OF CO–DEFENDANT'S STATEMENT DURING PRE–TRIAL QUESTIONING THAT HE "WANTED AN ATTORNEY" WAS ERRONEOUS AND GROSSLY PREJUDICIAL TO DEFENDANT'S RIGHT TO A FAIR AND IMPARTIAL VERDICT*

POINT III  *THE PROSECUTOR'S COMMENTS IN SUMMATION, VOUCH- ING FOR THE VERACITY OF THE STATE'S POLICE WITNESS, AND MAKING A "SAFE STREET" ARGUMENT TO THE JURY HAD THE CLEAR CAPACITY TO PRODUCE AN UNJUST VERDICT IN THIS CASE* [Not Raised Below]

POINT IV  *THE TRIAL COURT'S FAILURE TO LIMIT THE SCOPE OF THE STATE'S EXPERT WITNESS IN THIS CASE, COUPLED WITH THE COURT'S INSTRUCTIONS ON THE JURY'S USE OF EXPERT TESTIMO- NY, HAD THE CLEAR CAPACITY TO PRODUCE AN UNJUST RESULT* [Not Raised Below]

POINT V *THE MOTION JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS*

On this appeal defendant Felton argues:

POINT I *THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS IN-STRUCTIONS TO THE JURY, REQUIRING A REVERSAL OF DEFEN-DANT'S CONVICTION* [Not Raised Below]

a. *The trial court committed reversible error when it instructed the jury with respect to N.J.S.A. 2C:35-5 that the "State need not prove the Defendant's knowledge of the quantity of the drugs . . ."*

b. *The trial court erred in failing to instruct the jury on "mere presence" as an essential part of the definition of "constructive" possession*

POINT II *THE ADMISSION INTO EVIDENCE OF DEFENDANT'S STATE-MENT DURING PRE-TRIAL QUESTIONING THAT HE "WANTED AN ATTORNEY" WAS ERRONEOUS AND GROSSLY PREJUDICIAL TO DE-FENDANT'S RIGHT TO A FAIR AND IMPARTIAL VERDICT*

POINT III *THE PROSECUTOR'S COMMENTS IN SUMMATION VOUCHING FOR THE VERACITY OF THE STATE'S POLICE WITNESS, AND MAK-ING A "SAFE STREET" ARGUMENT TO THE JURY HAD THE CLEAR CAPACITY TO PRODUCE AN UNJUST VERDICT IN THIS CASE*

POINT IV *THE TRIAL COURT'S FAILURE TO LIMIT THE SCOPE OF THE STATE'S EXPERT WITNESS IN THIS CASE, COUPLED WITH THE COU[]RT'S INSTRUCTIONS ON THE JURY'S USE OF EXPERT TESTI-MONY, HAD THE CLEAR CAPACITY TO PRODUCE AN UNJUST RE-SULT*

POINT V *THE MOTION JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS*

POINT VI *THE TRIAL COURT SHOULD EXERCISE THE DISCRETION ALLOWED BY RULE 3:18-1 TO ORDER THE ENTRY OF A JUDGMENT AT ACQUITTAL AS THE EVIDENCE PRESENTED AT TRIAL WAS IN-SUFFICIENT TO WARRANT A CONVICTION*

We find no merit in the issue addressed to the motion to suppress the cocaine found in the trunk of the car in which defendants were riding. However, we reverse Felton's conviction because of constitutional error directed to his assertion of the right to counsel and remand for a new trial as to Felton. The merged count shall, of course, be unmerged for such purposes. We affirm Moore's conviction.

Felton was a passenger in a car being driven by Moore. The car bore North Carolina "dealer" license plates when stopped on the New Jersey Turnpike. Moore consented to a search of the

car, and cocaine was discovered in the trunk between the spare tire and the tire's rim.

The trial proofs included evidence, as detailed in the State's briefs, which were substantially identical, as follows: [2]

Trooper Bell testified that he learned on the date of the arrest that neither Felton nor Moore owned the Honda. Bell also described how he, Detective John McNally and Detective Jeff McCarthy questioned Felton while at headquarters. Defendant told the officers that he graduated from North Carolina Central College and that he was employed at a Jiffy Lube as a mechanic. He explained that he and Moore were childhood friends. Felton stated Moore and his niece were driving to New York to visit somebody. He rode along with them and visited his girlfriend while in the city. Felton stated that Trooper Bell stopped them on their return trip to North Carolina. When asked about the cocaine, Felton asked for an attorney and the interrogation ceased. Next, Trooper Bell and the two detectives questioned Moore. Despite having told Trooper Bell at the scene of the stop that he had borrowed the Honda from his former employer, Cherry Used Cars, Moore informed the officers that he had purchased the Honda at an automobile auction.

[Citations omitted.]

The State's proofs also included evidence regarding the search and expert testimony concerning the cocaine and its impact on defendants' intent.

A *Miranda* hearing was held to determine the admissibility of statements made by the defendants after their arrest. The arresting officer, State Trooper David Bell, testified at the hearing, in relevant part:

Q Now, after they were given their warnings did, were they questioned?

A Yes, sir. They were.

Q And do you recall the questioning of Mr. Felton?

A Yes.

Q And you were present for that?

A Yes, sir.

Q What was it, an oral or written statement?

A It was an oral statement.

Q Do you recall the substance of that statement that he gave?

A I do recall it. Yes.

Q What did he say? What did Mr. Felton first say?

---

2 We have substituted names for the name of the defendant or co-defendant and omitted reference to such, as the case may be, and have omitted citations.

A   He stated, aside from personal background, but pertaining to the case, he stated that he had come for a ride with his friend on a Monday morning, the day prior, to drop off his friend's niece, Charles Moore's niece.

Q   Did he indicate the niece's name?

A   I believe it was Tasha.

Q   And did he indicate that he dropped her off in Manhattan at Ninety–Fifth Street?

A   Yes.  He did.

Q   And did he indicate where they were heading when they were stopped by you?

A   They were heading back toward North Carolina.  Home.

Q   Did you ask Mr. Felton the name of Tasha's boyfriend?

A   I believe that was Detective McCarthy.

Q   Did you hear Detective McCarthy?

A   Yes.

Q   Did you hear what his answer was?

A   Yes.

Q   What was it?

A   He stated he couldn't remember the name.

Q   And did you ask him also if he knew about the cocaine in the vehicle?

A   Yes.

Q   And what did he say?

A   He stated that he knew nothing of it and I believe at that point he asked for an attorney.

Q   Did you—Did the questioning cease at that point?

A   Yes, sir.

Over objection of both defendants the trial judge ruled that defendant's request for counsel was admissible.  The judge apparently agreed with the State that the State was entitled to show "why the questioning ceased."  The judge ultimately ruled:

There may be testimony, and certainly there was already testimony from the trooper, that he advised the Defendant of his *Miranda* rights.  The *Miranda* rights are you have the right to remain silent.

You have the right to an attorney.

You don't have to make any statements, or something similar to that, until you speak to an attorney.

He said, "I want an attorney."

He could have said I want to remain silent and he could have said a lot of things. All those things would be admissible.

Therefore, the Court finds the statement where he chose to follow the *Miranda* warnings and stated "I want an attorney" is admissible in evidence.

Trooper Bell's testimony regarding Felton's interrogation was more abbreviated at trial. We quote the colloquy:

Q   Who did you question first, Mr. Felton or Mr. Moore?

(No response.)

Q   Do you recall?

A   I didn't question any of them at the, during the processing.

Q   I mean at some point at headquarters at the processing were either of them, did you talk to either of them?

A   Yes.

Q   Did you talk to both of them?

A   Yes.

Q   Where, where did you talk to Mr. Felton?

A   In the Detective Bureau in the back of our barracks.

Q   Who was there?

A   It was myself, Detective John McNally and Detective Jeff McCarthy.

Q   And who did you interview first?

A   We interviewed Mr. Felton first.

Q   Now, did he indicate to you at headquarters why he had traveled to New York?

A   Yes.

Q   Why?

A   He stated that he just took a ride with his friend to drop off his niece in New York.

Q   How did the questioning of Mr. Felton end?

A   When he was asked about the cocaine in the car he stated that he wanted to talk to an attorney first.

Q   And at that point you stopped questioning him?

A   Yes.

Q   And that's because that's your procedure in the barracks?

A   That's his constitutional right. Yes. That's it.

Both defendants objected to the testimony. They pointed out that at the pretrial hearing Trooper Bell had testified that Felton indicated he knew "nothing about the drugs," while at trial the prosecutor almost immediately inquired about why the interview had ended, receiving the answer that Felton had asked for an attorney as soon as he was questioned about his knowledge of the cocaine. Hence, they claimed the trial testimony created a "whole different meaning" and a "false impression" and was "totally

inconsistent with the proffer." [3]   Defendants also noted a Fifth Amendment violation of the "privilege to remain silent."   Moore's counsel said there was no "way of curing it" and "[d]idn't see how you can cure it with a curative charge."

The defense moved for a mistrial contending that the jurors would have to believe that invocation of the right to counsel was inconsistent with defendants' lack of knowledge of the existence of the cocaine.

The prosecutor noted his lack of objection to a limiting instruction as to the right of a defendant to invoke "his right" to request an attorney and that the "officer acted properly in stopping questioning at that point."

The court then ruled:

As the Court earlier indicated, the statement is admissible in evidence.

The Court will give an instruction to the jury that they are not to conclude that, one, exercising a constitutional right to remain silent, that that is to be used against him or any adverse inference is to be drawn.   That's number one.

. . . .

The Court finds that the moment the Defendant stated he wanted an attorney the trooper ceased any further interrogation and respected the Defendant's right to remain silent.

The conclusion is that the State has proved beyond a reasonable doubt, which is the standard of proof, that when Defendant made that statement he was previously advised of his *Miranda* rights, and he made the statement, and the statement is admissible.

The Court will tell the jury the mere fact that he exercised his right to remain silent, an adverse inference is not to be drawn against him.

The application for a mistrial is denied.

The Court finds that there has not been such prejudice shown against either Defendant of the testimony of the trooper that would warrant such a, an extreme finding, or a finding of impropriety or improper conduct or statements that are so contradictory that a mistrial should be granted.

However, no limiting instruction was immediately given.   The next day after all evidence was presented, the judge indicated he would

---

[3] As the position of the defendants was similar in this respect, we have attributed comments of both counsel to both defendants.

give the instruction, but Felton's counsel asked the judge not to "repeat it now or highlight" the testimony.

In *Doyle v. Ohio*, 426 *U.S.* 610, 618, 96 *S.Ct.* 2240, 2245, 49 *L.Ed.*2d 91, 98 (1976), the United States Supreme Court held that the *Miranda* warning contained an implied promise that "silence will carry no penalty" and that post–*Miranda* silence could not be used "to impeach an explanation subsequently offered [by the defendant] at trial." In *Wainwright v. Greenfield*, 474 *U.S.* 284, 295 n. 13, 106 *S.Ct.* 634, 640 n. 13, 88 *L.Ed.*2d 623, 632 n. 13 (1986), the Supreme Court noted that post–*Miranda* silence (there used to counter an insanity defense) "includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." Under *Greenfield*, "[w]hat is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." 474 *U.S.* at 295, 106 *S.Ct.* at 640, 88 *L.Ed.*2d at 632; *see also State v. Lyle*, 73 *N.J.* 403, 375 *A.*2d 629 (1977); *State v. Deatore*, 70 *N.J.* 100, 358 *A.*2d 163 (1976); *State v. Ripa*, 45 *N.J.* 199, 204, 212 *A.*2d 22 (1965) (pre-*Miranda* ); *State v. Hyde*, 292 *N.J.Super.* 159, 678 *A.*2d 717 (App.Div.1996); *compare State v. Carroll*, 256 *N.J.Super.* 575, 601–02, 607 *A.*2d 1003 (App.Div.), *certif. denied*, 130 *N.J.* 18, 611 *A.*2d 656 (1992).

■ The State was entitled to develop what Felton told the troopers in order to establish his relationship with Moore, to show he was not a "mere passenger" in the car and to develop an inference of his knowledge of its contents. The State contends that Trooper Bell's reference to defendant Felton's request for an attorney was relevant to why his questioning at headquarters ended so abruptly. Our view of the case might be different had the State developed before the jury the colloquy referred to at the pretrial hearing followed by an immediate and effective limiting instruction. However, even then the State had an obligation to "carefully frame[ ] questions" to avoid "any mention of the defendant's exercise of his constitutional rights to remain silent and to

consult counsel." *Greenfield, supra,* 474 *U.S.* at 295, 106 *S.Ct.* at 640, 88 *L.Ed.*2d at 632.

As developed the trial testimony regarding his statement essentially referred to Felton's invocation of the right to counsel and had to be understood as inculpatory. The undue prejudice to Felton is clear because he was a passenger who had no involvement with the car before the trip to New York and his knowledge of the existence of cocaine in the trunk was the only real issue in dispute.

■ We find no basis for reversing as to Moore. He testified and told the jury that he had placed the bid, or was with his brother-in-law who placed the successful bid, on the car at an auction from which it was purchased for the brother-in-law's used car dealership from which Moore borrowed it for the trip to New York. He thus responded to admitted testimony that at the scene of the stop he told Bell that "he had borrowed the car" from the dealership where he worked and a subsequent statement at headquarters that he had purchased the car "at an auction." He also described his trip with Felton while taking his niece to New York. They were stopped on the Turnpike while on their way back to North Carolina.

Moore denied knowledge that there were drugs in the trunk. The woman with whom Moore left his niece in New York confirmed much of Moore's explanation of the timing of defendants' arrival at and departure from her New York apartment. There was a two-to-three hour difference between the time defendants were said to leave the apartment and the Turnpike stop, and defendant testified he got caught in traffic at the George Washington Bridge.

We need not explore Moore's standing or ability to assert the breach of Felton's constitutional rights in furtherance of his claim that the admission of Felton's assertion of the right to counsel requires reversal of Moore's conviction. Here we find an insuffi-

cient showing of prejudice to warrant reversal. *Cf. State v. Deatore, supra,* 70 *N.J.* at 106–07, 358 *A.*2d 163.

There was no suggestion that Moore declined to talk with the police; in fact, Bell testified about Moore's post-arrest interview which following the giving of *Miranda* warnings and, unlike Felton, Moore testified before the jury.

■ As the case must be retried as to Felton, we add the following: In *State v. Torres,* 236 *N.J.Super.* 6, 13, 563 *A.*2d 1141 (App.Div.1989), *certif. denied,* 122 *N.J.* 153, 584 *A.*2d 222 (1990), we held "that in prosecutions under *N.J.S.A.* 2C:35–5 the jury must find that defendant manufactured, distributed, dispensed or possessed the relevant quantity or quality of C.D.S. by proof beyond a reasonable doubt" but "that the quantity and quality are not elements of the offense and, therefore, the State need not prove and the jury need not find that the defendant knew the quantity or the quality of the controlled dangerous substances involved." We added, however, that "the State has the burden of proving that the defendant purposely or knowingly" manufactured, distributed, dispensed or possessed the relevant quality or quantity. *Id.* at 13, 563 *A.*2d 1141. In other words, while the State has to prove how much the defendant possessed in order to satisfy the Code's grading provisions, and the jury has to so find beyond a reasonable doubt, the State does not have to prove that the defendant knew how much he possessed so long as it found beyond a reasonable doubt that the defendant knowingly possessed it.

Defendants are incorrect in their contention that *State v. Florez,* 134 *N.J.* 570, 636 *A.*2d 1040 (1994), held that it was plain error not to charge the jury that it had to find that defendant knew the relevant weight. In *Florez,* there was no instruction to the jury concerning weight of the cocaine as an element. There, the State conceded that weight was a material element of the offense of possession with intent to distribute and that the failure to instruct the jury on the weight as an element "requires reversal of the second degree conspiracy conviction." *Id.* at 595, 636 *A.*2d 1040.

Reversing on other grounds, the Court added that "we conclude that when this case is retried, the trial court should instruct the jury on the weight of the cocaine as an element of the crime charged." *Ibid.* at 595, 636 *A.*2d 1040.

Defendants seize on this language to argue their plain error claim. Here, as *Florez* directs, the jury was instructed as to the weight that had to be found to sustain the first degree conviction. The jury was expressly instructed that "[i]t is the State's burden to prove beyond a reasonable doubt the quantity of cocaine involved" [4] and that it must determine the relevant quantity necessary for grading purposes. In its verdict the jury found that both defendants possessed "five ounces or more."

The jury was not instructed—and *Florez* does not require an instruction—that defendant had to know that weight. In fact, the only case cited in *Florez* on this issue, *State v. Roberson,* 246 *N.J.Super.* 597, 607, 588 *A.*2d 434 (App.Div.1991), cites *Torres* but vacated the second degree conviction because the jury did not determine whether defendant possessed the requisite 3.5 grams of pure free base.

---

[4] The judge instructed the jury:

If you found the Defendant guilty of possession with intent to distribute you then must determine the quantity of cocaine involved.

It is the State's burden to prove beyond a reasonable doubt the quantity of cocaine involved.

The State need not prove the Defendant's knowledge of quantity of drugs so long as it proves beyond a reasonable doubt that the Defendant knowingly possessed the controlled dangerous substance.

Specifically you must determine which one of the following quantities has been proven:

Five ounces or more of cocaine, including any adulterants or dilutants.

Or one-half ounce or more, but less than five ounces of cocaine, including any adulterants or dilutants.

Or three, less than one-half ounce of cocaine, including any adulterants or dilutants.

After determining which of these quantities the State has proved beyond a reasonable doubt you should mark the appropriate section of the verdict sheet which will be supplied to you.

We find no need to discuss the other issues raised. *R.* 2:11–3(e)(2); *State v. Jordan,* 147 *N.J.* 409, 688 *A.*2d 97 (1997) (holding that failure to give *Hampton* and *Kociolek* charges was not plain error); *State v. Suazo,* 133 *N.J.* 315, 320–21, 627 *A.*2d 1074 (1993); *State v. Maristany,* 133 *N.J.* 299, 305–06, 627 *A.*2d 1066 (1993).

We affirm as to Moore and reverse and remand as to Felton.